SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**<u>Krug v. State Parole Board</u> (A-12-24) (089603)**

**Argued February 3, 2025 -- Decided August 11, 2025**

**WAINER APTER, J., writing for the Court.**

The Parole Act of 1948 permitted the Board to consider the merits of parole with reference to "all existing available records." The Parole Act of 1979 allowed the Board, at a second or subsequent parole hearing, to consider only "new information" filed since the prior hearing. A 1997 amendment abolished that new-information limitation and allowed the Board, during second or subsequent hearings, to once again consider all relevant information about an inmate. In this appeal, the Court considers whether the State Parole Board's determination to consider all relevant information about appellant Fred Krug -- rather than only "new information" filed since his last parole hearing -- violated the ex post facto protections of the federal and state constitutions.

Krug committed the crimes for which he is now incarcerated in 1973. The Parole Board denied Krug's applications for parole in 1994, 1995, 2012, and 2016. In August 2022, Krug became eligible for parole for a fifth time. Although Krug incurred thirty disciplinary infractions while in prison, he has been infraction-free since 2003, except for one refusal to submit to a search in 2017. A Board panel held a parole hearing in January 2023 and again denied parole by filling out a one-page form. As reasons for the denial, the panel checked twelve boxes related to pre-2016 information. The panel also checked four boxes possibly related to information gathered since the 2016 hearing. The panel checked six boxes for mitigating information. However, the panel ultimately checked a box labeled "(Prior to 8/19/1997)" that read, "The Panel has determined a substantial likelihood exists that you would commit a new crime if released on parole at this time." The panel set a future eligibility term of thirty-six months.

Krug appealed to the full Board, arguing, among other things, that the panel violated the 1979 Act by "present[ing] no new evidence since previous . . . denials of parole to justify his continued confinement." In a final agency decision, the full Board affirmed the panel's determinations. The Appellate Division affirmed the denial of parole. The Court granted certification. 258 N.J. 510 (2024).

1

**HELD:**  Constitutional ex post facto prohibitions forbid only punishment beyond what was contemplated at the time the crime was committed.  Because the law at the time of Krug's offenses permitted the Board to consider the same "all existing" information it may now consider, retroactive application of the 1997 amendment to Krug created no risk of additional punishment.  The Court therefore rejects Krug's ex post facto challenge.

1.  Under the Parole Act of 1948, the Parole Board was required to assess whether the inmate had served enough time in prison and been sufficiently punished in terms of both society's need for adequate punishment and the inmate's rehabilitation.  In 1979, the New Jersey penal laws underwent a significant change.  The Legislature adopted a new Code of Criminal Justice, requiring more definite and severe sentences, including mandatory minimum terms.  At the same time, the 1979 Act replaced the 1948 Act's dual considerations of (1) the likelihood of recidivism and (2) the sufficiency of punishment with only one criterion:  whether the inmate would likely commit another crime if released.  It thus precluded the Parole Board from considering whether the prisoner had been sufficiently punished.  And it created a presumption in favor of release, shifting the burden to the State to prove that the prisoner should not be released.  As to second and subsequent hearings, the 1979 Act narrowed the information on which the Board could rely to deny parole, providing that "[a]n inmate shall be released on parole . . . unless new information . . . indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released . . . at such time."  The 1979 Act's new-information limitation was interpreted to mean the Board was required to base its decision strictly on information developed since the previous denial of parole and could not deny parole at subsequent hearings if there had been no institutional infractions committed by the inmate since the last review.  (pp. 11-14)

2.  In 1995, then-Governor Whitman appointed a Study Commission on Parole to undertake a thorough study of the parole system.  The Commission published a final report with recommendations to expand the authority of the Parole Board to deny parole to inmates who cannot safely be returned to the community.  It recommended removing the 1979 Act's new-information limitation during second and subsequent parole hearings to allow a comprehensive review of all relevant information in an inmate's record.  In 1997, the Legislature accepted the Commission's recommendations and amended the Parole Act.  The amended Act allowed the Board to deny parole if it found, by a preponderance of the evidence, that the inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed, and it adopted that same new substantive standard for second and subsequent hearings, abolishing the requirement that the Board consider only new information.  (pp. 15-18)

2

3.  The New Jersey and United States Constitutions both prohibit ex post facto laws -- a law that imposes a punishment for an act not punishable at the time it was committed or imposes additional punishment beyond what was prescribed at the time of commission.  Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint.  The U.S. Supreme Court has applied the same analysis when examining a change to a parole law.  The controlling inquiry is whether retroactive application of the new parole law created a sufficient risk of increasing the measure of punishment attached to the covered crimes, or created a significant risk of prolonging an individual's incarceration beyond that contemplated at the time the crime was committed.  Thus, when confronted with the claim that a parole law has worked an ex post facto violation on an inmate, a court must compare the allegedly offensive parole law with the parole law in effect at the time of the inmate's crime and ask whether the parole standards of the newer act are more rigorous or burdensome than were the standards of the older one.  (pp. 18-22)

4.  The Court discusses decisions addressing ex post facto challenges to the 1979 Act and the 1997 amendments in state and federal court.  Trantino v. State Parole Board (Trantino V) correctly stated that "[t]he critical inquiry is whether the statute realistically produces a sufficient risk of increasing the measure of punishment as to offend the constitutional prohibition."  331 N.J. Super. 577, 610 (App. Div. 2000).  But it also implied that a "procedural modification that does not constitute a substantive change in the parole release criteria" cannot violate the Ex Post Facto Clause.  Ibid.  Under controlling U.S. Supreme Court precedent, "simply labeling a law 'procedural' . . . does not thereby immunize it from scrutiny under the Ex Post Facto Clause."  Collins v. Youngblood, 497 U.S. 37, 46 (1990).  To the extent Trantino V has been read to mean that procedural changes cannot violate the State or Federal Ex Post Facto Clauses, the Court overrules that decision.  (pp. 22-27)

5.  But the ex post facto analysis is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred.  That remains true when it comes to changes in parole laws.  At the time of Krug's offense, the Board was entitled to review "old" information, including an inmate's criminal history and the seriousness of the offense for which the inmate was incarcerated.  The 1997 amendment restored the Board's ability to consider that information.  In so doing, it poses no risk of increasing Krug's punishment beyond what was contemplated at the time of his offense.  (pp. 27-29)

6. The Court explains that its agreement with the Board on the meaning of the Ex Post Facto Clause does not in any way signal approval of its litigation position either in this case or in earlier cases.  But although the Court does not condone the Board's litigation position in this case, that does not change the meaning of the Federal and

3

State Ex Post Facto Clauses. The Court does not opine on whether the facts of this case, or any case involving a change in law that conferred a benefit on an inmate for many years, and then subsequently repealed that benefit, could implicate due process or fundamental fairness concerns. (pp. 29-32)

**AFFIRMED AS MODIFIED.**

**JUSTICE NORIEGA, dissenting,** expresses the view that, rather than a rigid formula, the constitutional principles that animate the Ex Post Facto Clause -- notice, governmental restraint, and preservation of the social compact between the government and the governed -- should drive an ex post facto analysis. Justice Noriega notes that focusing an ex post facto analysis on whether a new law increases punishment when compared to the law in effect at the time of the offense works well in the typical sentencing case scrutinizing a single legislative change, but that parole is different because, over the potentially very long period during which an incarcerated individual is subject to a parole regime, the government may legitimately change that regime to the individual's advantage, revising the social compact and thereby recentering the ex post facto analysis away from the offense date and onto the legislative change. Here, Justice Noriega writes, the Legislature subjected Krug and similarly situated individuals to the 1979 Parole Act when it passed the provision, which replaced and repealed the 1948 Act for all those incarcerated at the time. In Justice Noriega's view, the Ex Post Facto Clause was specifically designed to forbid and prevent maneuvering such as the 2022 application to Krug's case of the more restrictive parole conditions enacted in 1997.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, and HOFFMAN join in JUSTICE WAINER APTER's opinion. JUSTICE NORIEGA filed a dissent.**

4

Fred Krug,

Appellant-Appellant,

v.

New Jersey State
Parole Board,

Respondent-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 3, 2025 | August 11, 2025 |

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Christopher J. Ioannou, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Michael Zuckerman, Deputy Solicitor General, and Janet Greenberg Cohen, Assistant Attorney General, of counsel, and Christopher J. Ioannou, Christopher C. Josephson, and Robert McGuire, Deputy Attorneys General, on the briefs).

Dominique Kilmartin argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey

(Pashman Stein Walder Hayden, attorneys; Dominique Kilmartin, on the brief).

Jaclyn DeMais argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Greenberg Traurig, and American Civil Liberties Union of New Jersey Foundation, attorneys; Jaclyn DeMais, Ian S. Marx, Rebecca Zisek, Jeanne LoCicero, and Ezra D. Rosenberg, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

This case arises from legislative changes to the information the State Parole Board may consider in granting or denying parole. The Parole Act of 1948 permitted the Board to consider the merits of parole with reference to "all existing available records." L. 1948, c. 84, § 9. The Parole Act of 1979 allowed the Board, at a second or subsequent parole hearing, to consider only "new information" filed since the prior hearing. L. 1979, c. 441, § 12(c). A 1997 amendment abolished that new-information limitation and allowed the Board, during second or subsequent hearings, to once again consider all relevant information about an inmate. L. 1997, c. 213, § 2 (codified at N.J.S.A. 30:4-123.56(c)).

Appellant Fred Krug committed the murder and other crimes for which he is now incarcerated in 1973. After he was denied parole for the fifth time, he argued the Board's retroactive application of the 1997 amendment's repeal

2

of the 1979 Act's new-information limitation violates the ex post facto protections of the federal and state constitutions. Although we disapprove of the Board's untimely assertion of this argument, we agree that constitutional ex post facto prohibitions forbid only punishment beyond what was contemplated at the time the crime was committed. Because the law at the time of Krug's offenses permitted the Board to consider the same "all existing" information it may now consider, we hold that retroactive application of the 1997 amendment to Krug created no risk of additional punishment.

We therefore reject Krug's ex post facto challenge. We do not reach whether the Board's conduct in this case could support a claim grounded in federal or state due process guarantees, or the doctrine of fundamental fairness.

## I.

In September 1973, when he was twenty-six years old, Krug killed P.T. by beating her, tying her hands behind her back, and throwing her, naked, into the Raritan River. In December 1973, Krug attacked H.P. in the laundry room of her apartment building. He bound her, assaulted her, and threatened to kill her. Krug fled the scene and, when stopped by police, punched an officer in the eye.

Krug committed those offenses while on parole. He had previous convictions for assault with a deadly weapon, rape, aggravated assault,

3

disorderly conduct, and larceny.  He also had two earlier parole violations and a probation violation.

In 1974, Krug was tried before a jury.  He was convicted of murdering P.T. and sentenced to life imprisonment.  Krug pleaded guilty to assault with intent to kidnap and threatening to take a life for his crimes against H.P., and assault and battery on a police officer.  He was sentenced to twenty-three years' imprisonment, consecutive to the life sentence already imposed.  Krug has been imprisoned ever since.

The Parole Board denied Krug's applications for parole in 1994, 1995, 2012, and 2016.  In August 2022, Krug, who was then 75 years old, became eligible for parole for a fifth time.  A two-member Parole Board panel initially denied parole.  The panel then vacated its decision and ordered a new psychological evaluation.  The psychological evaluation found Krug to be a "moderate risk for future violence" and predicted a "fair to poor" likelihood of successfully completing parole.

Although Krug incurred thirty disciplinary infractions while in prison, he has been infraction-free since 2003, except for one refusal to submit to a search in 2017.

A new two-member Board panel held a parole hearing on January 23, 2023, and again denied parole by filling out a one-page form.  As reasons for

4

the denial, the panel checked twelve boxes related to pre-2016 information: (1) "facts and circumstances of offense(s)"; (2) "prior offense record is extensive"; (3) "offensive record is repetitive"; (4) "prior offense record noted"; (5) "nature of criminal record increasingly more serious"; (6) "committed to incarceration for multiple offenses"; (7) "prior opportunity(ies) on . . . parole[] terminated/revoked for the commission of new offense(s)"; (8) "committed new offense(s) on community supervision . . . parole"; (9) "prior opportunity(ies) on . . . (probation/parole) has (have) failed to deter criminal behavior"; (10) "prior opportunity(ies) on . . . (probation, parole) has (have) been violated/terminated/revoked in the past for technical violation(s)"; (11) "prior incarceration(s) did not deter criminal behavior"; and (12) "institutional infraction(s): numerous/persistent/serious in nature."

The panel also checked four boxes possibly related to information gathered since the 2016 hearing: (1) "institutional infraction(s) (since last panel hearing)"; (2) "insufficient problem(s) resolution"; (3) "lack of adequate parole plan to assist in successful reintegration into the community"; and (4) "risk assessment evaluation." In addition, the panel wrote on the form that Krug "shows no signs of remorse for victims," "downplays his criminal behavior," "has not fully addressed criminal sexual behavior," "has no

5

adequate parole plan" and "[Krug's] criminal thinking and behavior are [of] concern by failing to comply with previous supervision."

The panel checked six boxes for mitigating information: (1) "participation in program(s) specific to behavior"; (2) "participation in institutional program(s)"; (3) "favorable institutional adjustment"; (4) "attempt made to enroll and participate in program(s) but was not admitted"; (5) "commutation time restored"; and (6) "minimum custody status achieved/maintained."

However, the panel ultimately checked a box labeled "(Prior to 8/19/1997)" that read, "The Panel has determined a substantial likelihood exists that you would commit a new crime if released on parole at this time." The panel set a future eligibility term of thirty-six months. Going forward, it recommended that Krug "remain infraction free" and "finish current programs."

Krug appealed to the full Board, arguing, among other things, that the panel violated the 1979 Act by "present[ing] no new evidence since previous . . . denials of parole to justify his continued confinement." In a final agency decision dated April 26, 2023, the full Board affirmed the two-member panel's determinations. As to Krug's argument regarding new evidence, the Board explained that "the Parole Act of 1979 was amended in 1997 and pursuant to

those amendments, the Board is no longer restricted to considering only new information."  Instead, "[a]t each time of parole consideration, the Board may consider the entire record and . . . if deemed appropriate, may cite some of the same or different reasons for parole denial."  The Board observed that "[m]ost of the information in your case remains the same" but other information "has changed . . . since your last Board panel hearing, such as your institutional disciplinary record and program participation."

Krug appealed to the Appellate Division.  He argued that the Board's consideration of "all information" pursuant to the 1997 amendment, rather than only "new information" as required by the 1979 Act, violated the constitutional prohibitions on ex post facto laws because it "substantially increased the risk of prolonging [his] incarceration."  Most of the reasons the panel checked for denying parole, Krug maintained, "constituted old information."  He urged the Appellate Division to overrule Trantino v. State Parole Board (Trantino V), 331 N.J. Super. 577 (App. Div. 2000), its prior decision upholding retroactive application of the 1997 amendment's repeal of the 1979 Act's new-information limitation.  By holding that the repeal was a mere "procedural" change and thus could not violate the Ex Post Facto Clause, Krug asserted that Trantino V applied the wrong constitutional standard.

7

The Appellate Division affirmed the denial of parole, citing its prior holding in Trantino V that the 1997 amendment's removal of the new-information limitation was "a procedural modification that does not constitute a substantive change in . . . parole release criteria." It also found that "new information gleaned from Krug's parole interview and in-depth psychological evaluation figured prominently in the Board's decision." Therefore, the Appellate Division concluded, "the application of the 1997 amendment in this case did not create a significant risk of increasing Krug's punishment" under Garner v. Jones, 529 U.S. 244, 255 (2000).

Krug petitioned this Court for certification, asking that we resolve whether the "substantive/procedural analysis . . . pronounced in" Trantino V "fail[s] to comport" with United States Supreme Court precedent, as the Third Circuit recognized in Holmes v. Christie, 14 F.4th 250 (3d Cir. 2021). We granted the petition, limited to that question. 258 N.J. 510 (2024). We also granted leave to appear as amici curiae to the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

II.

Krug argues that retroactive application of the 1997 amendment eliminating the 1979 Act's new-information limitation "flatly" violates "state

8

and federal ex post facto protections as there is virtually no conceivable situation where it would not pose a sufficient risk of harm to the inmate" being considered for parole. In the alternative, he alleges an as-applied ex post facto violation in his case because "every statement of reasons" the Board made "for denying parole cites substantially to old information."

The ACLU joins Krug and "urges the Court to reject the Appellate Division's continued use of an outdated and incorrect substantive-versus-procedural standard when considering [ex post facto] challenges," and to "instead mandate that courts consider whether the retroactive application of a new law 'creates a significant risk of prolonging [the inmate's] incarceration.'" (quoting Garner, 529 U.S. at 244). The ACDL agrees that "Trantino V should be overruled" because it "ignore[s] U.S. Supreme Court and Third Circuit precedent."

In its supplemental brief to this Court, the Board argues -- for the first time -- that "the proper baseline for the constitutional ex post facto analysis is the law actually in place when [Krug] committed his crime": in this case, the Parole Act of 1948. Because that law "placed no limitation on the information the Parole Board could consider at successive parole hearings," "there is no risk, let alone a significant one, that removing the new-information limitation would increase Krug's punishment relative to the law in place when he

9

committed his crimes." The Board acknowledges that it raised that argument for the first time in its supplemental brief to this Court. But the Board submits it "consistently opposed Krug's ex post facto claim on the merits," and "the fact that it did not make this precise argument cannot change" the meaning of constitutional ex post facto protections.

Krug responds that the Board's new argument was waived because it was not raised in the administrative proceeding or before the Appellate Division. Nor, Krug maintains, did the Board ever raise it in other cases that considered ex post facto challenges to the 1997 amendment, including Trantino V and Holmes, "both of which involve people who, like Mr. Krug, were sentenced prior to the 1979 Act." Therefore, Krug contends, this Court should not consider the Board's argument.

## III.

## A.

We review questions of statutory and constitutional interpretation de novo, owing no deference to the Appellate Division's legal conclusions. State v. Pomianek, 221 N.J. 66, 80 (2015).

B.

1.

The Parole Act of 1948 created the State Parole Board "to determine when, and under what conditions . . . [inmates] may be released upon parole." L. 1948, c. 84, §§ 1, 5. The Act required the then-Department of Institutions and Agencies (the predecessor to the current Department of Corrections (DOC)), to "furnish[] the said board all pertinent information and data relating to the record of the prisoner while under sentence, and such further information . . . concerning his prior record . . . as well as a complete report on the prisoner's social, physical, mental and psychiatric condition and history." Id. § 7. It provided that once "the board has been furnished all existing available records pertaining to the prisoner it shall consider the merits of his parole." Id. § 9.

The 1948 Act specified that a prisoner could be released on parole "only if the board [determined] that there is reasonable probability that, if such prisoner is released, [1] he will assume his proper and rightful place in society, without violation of the law, and [2] that his release is not incompatible with the welfare of society." Id. § 14. Under the second factor, "the sufficiency of punishment was a highly relevant consideration in parole determinations." In re Trantino Parole Application (Trantino II), 89 N.J. 347, 368 (1982). "The

11

Parole Board was required to assess whether the inmate had served enough time in prison and been sufficiently punished in terms of both society's need for adequate punishment and the inmate's individual progress toward rehabilitation." Ibid. That included consideration of "the seriousness of the crime as an element in determining whether the offender's punishment ha[d] been adequate." Id. at 373-74.

2.

"In 1979, the New Jersey penal laws underwent a significant change." Royster v. Fauver, 775 F.2d 527, 529 (3d Cir. 1985). The Legislature adopted a new Code of Criminal Justice, requiring "more definite and severe sentences." Trantino II, 89 N.J. at 368. Those included "mandatory minimum terms" that inmates were required to serve before they could be considered for parole. Id. at 369. In doing so, the Legislature largely transferred the determination of the "adequacy of punishment" for a crime from the Board to the judiciary "to be exercised at the time of sentencing." Ibid.

At the same time, our parole laws underwent "significant changes to complement the Code's sentencing scheme." Id. at 368. The 1979 Act replaced the 1948 Act's dual considerations of (1) "the likelihood of recidivism" and (2) the "sufficiency of punishment" with only one criterion: whether the inmate would likely commit another crime if released. Id. at 367-

12

68.  It thus precluded the "Parole Board from considering whether the prisoner had been sufficiently punished so as to serve society's need for deterrence and retribution."  Trantino V, 331 N.J. Super. at 604.  And it created a presumption in favor of release, "shift[ing] the burden to the State to prove that the prisoner . . . should not be released."  State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983).  The Act thus provided:  "An adult inmate shall be released on parole at the time of parole eligibility, unless information supplied . . . indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released on parole at such time."  L. 1979, c. 441, § 9(a).

As to second and subsequent hearings, the 1979 Act carried over the presumption of release and the new substantive standard, but narrowed the information on which the Board could rely to deny parole.  It read:  "An inmate shall be released on parole on the new parole eligibility date unless new information filed . . . indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released on parole at such time."  Id. § 12(c) (emphasis added).  The Parole Act of 1979 thus "effected a radical change in the parole system in New Jersey."  Trantino II, 89 N.J. at 355.

The Act explicitly provided that it would "apply to all persons now serving or hereafter sentenced or committed to State correctional facilities." L. 1979, c. 441, § 2(a). However, in Trantino II, we recognized that, for inmates sentenced prior to the 1979 Code of Criminal Justice, to whom the Code's longer sentences and mandatory minimum terms did not apply, "[t]he punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred." 89 N.J. at 370. We therefore held that, even under the 1979 Act, in which the Legislature had expressly removed consideration of the sufficiency of punishment, for inmates "serving sentences imposed prior to the enactment of the [Code]" "the Board must consider whether the punitive aspects of a sentence have been satisfied in terms of the rehabilitative potential of the inmate." Id. at 367, 373.

3.

The 1979 Act's new-information limitation was interpreted to mean that the Board was "required to base its decision strictly on information developed since the previous denial of parole," Assemb. L. & Pub. Safety Comm. Statement to A. 21 1 (Mar. 3, 1997), and could not "deny[] parole at subsequent hearings if there [had] been no institutional infractions committed by the inmate since his or her last review," Final Report of the Study Commission on Parole (Commission Report) 21 (Dec. 23, 1996). "In practice,

14

this prevented the Board from taking account of inmates' criminal history --
often the most damaging aspect of their records -- after the initial hearing."
Holmes, 14 F.4th at 255.

In 1995, then-Governor Whitman appointed a Study Commission on
Parole to "undertake a thorough study of the parole system and . . . make
recommendations on how to improve" it. Exec. Order No. 39 (July 25, 1995),
https://nj.gov/infobank/circular/eow39.htm. The Commission published a final
report with recommendations "to expand the authority of the Parole Board to
deny parole to inmates who cannot safely be returned to the community."
Commission Report 5.

The Commission first recommended that "[t]he substantive standard for
determining whether to grant parole should be amended to increase the
discretion of the Parole Board to deny parole when an inmate . . . failed to
cooperate in his or her own rehabilitation" or when there was "a reasonable
expectation . . . that the inmate would violate conditions of parole if released."
Id. at 15. The Commission emphasized that its recommended amendment
would "represent[] a significant change to the substantive standard for granting
or denying parole." Id. at 16. That was true both because "the proposed
'reasonable expectation' standard is far less onerous than the current
'substantial likelihood' formulation" and because the Board "would be

15

authorized to deny parole based on a prediction that the inmate would violate parole conditions," rather than only based on a prediction that the inmate would commit a new crime. Id. at 16-18.

The Commission also took aim at the 1979 Act's new-information limitation during second and subsequent parole hearings, concluding it was "one of the most significant and inappropriate limitations . . . on the Board's discretion." Id. at 21. The Commission criticized the limitation for "effectively requir[ing]" the Board "to grant parole, even though the inmate may not be rehabilitated." Ibid. According to the Commission, "permit[ting] the Parole Board to use only 'new' information to deny parole at a second or subsequent hearing substantially and unnecessarily limits the Board's ability to review an inmate's rehabilitation in the context of the inmate's entire record." Id. at 21-22. The Commission therefore "strongly recommend[ed] a change in the law that would allow a comprehensive review of all relevant information contained in an inmate's record." Id. at 22. In the Commission's view, "[t]he Parole Board should have the ability to deny parole based on the entire record, and should not be limited to a consideration based solely on new information." Ibid.

16

4.

In 1997, the Legislature accepted the Commission's recommendations and amended the Parole Act. See Sponsor's Statement to A. 21 (L. 1997, c. 213) ("This bill is based upon recommendations of the Study Commission on Parole."). As to the substantive standard, the Legislature preserved the 1979 Act's presumption of release but expanded the grounds upon which the Board could deny parole. Whereas the 1979 Act allowed the Board to deny parole only if it found a "substantial likelihood that the inmate will commit a crime," L. 1979, c. 441, § 9(a), the 1997 amendment, as the Commission had advised, allowed the Board to deny parole if it found, by a preponderance of the evidence, that "the inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed." L. 1997, c. 213, § 1 (codified at N.J.S.A. 30:4-123.53(a)).

The Legislature adopted that same new substantive standard for second and subsequent hearings. And, as the Commission had urged, it abolished the requirement that the Board consider only new information. The statute was thus amended to read:

> An inmate shall be released on parole on the new parole eligibility date unless information filed . . . indicates by a preponderance of the evidence that the inmate has failed to cooperate in his or her own rehabilitation or

that there is a reasonable expectation that the inmate will violate conditions of parole . . . if released on parole at that time.

[Id. § 2 (codified at N.J.S.A. 30:4-123.56(c)).]

C.

The New Jersey and United States Constitutions both prohibit ex post facto laws. N.J. Const. art. IV, § 7, ¶ 3 ("The Legislature shall not pass any . . . ex post facto law . . . ."); U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . ex post facto Law . . . ."). "We have interpreted the Ex Post Facto Clause in the State Constitution in the same manner as its federal counterpart." State v. Brown, 245 N.J. 78, 88 (2021).

The United States Supreme Court has held "[t]he ex post facto prohibition forbids . . . any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" Weaver v. Graham, 450 U.S. 24, 28 (1981) (footnote omitted) (quoting Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26 (1867)).

The understanding that the Federal Ex Post Facto Clause prohibits punishment beyond what was prescribed at the time the crime was committed has remained constant for centuries. See Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.) (noting the prohibition of "[e]very law that

18

changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138 (1810) ("An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed."); Beazell v. Ohio, 269 U.S. 167, 169-70 (1925) (stating that any statute that "makes more burdensome the punishment for a crime, after its commission . . . is prohibited as ex post facto").

Our Court has adopted the same approach. See Brown, 245 N.J. at 88 ("[T]he court must determine whether the law, as retrospectively applied, imposes additional punishment to an already completed crime." (quoting Riley v. State Parole Bd., 219 N.J. 270, 285 (2014))).

The focus on punishment beyond that contemplated at the time the crime was committed reflects the purpose of our constitutional ex post facto protections. As the U.S. Supreme Court has observed, "[c]ritical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver, 450 U.S. at 30. Those are "the central concerns of the Ex Post Facto Clause." Lynce v. Mathis, 519 U.S. 433, 441 (1997).

19

The U.S. Supreme Court has applied the same analysis when examining a change to a parole law. The "controlling inquiry" is whether retroactive application of the new parole law "created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes,'" Garner, 529 U.S. at 250 (quoting Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995)), or "create[d] a significant risk of prolonging [an individual]'s incarceration," id. at 251, beyond that contemplated at the time the crime was committed. In both Garner and Morales, the Court compared the amended parole law to the parole law in effect at the time the inmate committed the offense and found no significant risk of increased punishment. See Garner, 529 U.S. at 247, 257 (comparing a Georgia regulation "[a]t the time respondent committed his second offense," which required the Board to reconsider an inmate for parole every three years, to a new regulation promulgated "after respondent had begun serving his second life sentence," which provided that reconsideration for inmates serving life sentences would take place "at least every eight years," and holding the amendment did not create any "significant risk of increased punishment for respondent"); Morales, 514 U.S. at 503, 514 (comparing California's "law in place at the time respondent murdered" the victim, which required subsequent parole hearings to be held every year, to a later statutory amendment that authorized the Board "to defer subsequent [parole] hearings

20

for up to three years" and holding the new law created "only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes").

Applying those and similar precedents, the Third Circuit has explained that, "[w]hen confronted with the claim that a parole law has worked an ex post facto violation on an inmate, a court must compare the allegedly offensive parole law with the parole law in effect at the time of the inmate's crime" and "ask whether the parole standards of the newer act are more rigorous or burdensome than were the standards of the older one." Royster, 775 F.2d at 533; see also Mickens-Thomas v. Vaughn, 321 F.3d 374, 391-92 (3d Cir. 2003) (citing Garner and holding that "an offender, prior to his conviction and sentencing, is entitled to know not only his maximum possible punishment, but also his or her chances of receiving early release," "so that they can plea bargain and strategize effectively," and "[t]herefore, a sentence that contained the right to parole consideration would give rise to a constitutional expectation that the parole guidelines extant at the time of the crime" would continue to apply throughout the person's incarceration).

Finally, although more than 100 years ago the U.S. Supreme Court asked whether a new law was substantive or procedural in evaluating ex post facto challenges, see Kring v. Missouri, 107 U.S. 221, 224 (1883); Thompson v.

21

Utah, 170 U.S. 343, 351-52 (1898), it has since clarified that "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause," Collins v. Youngblood, 497 U.S. 37, 46 (1990).

D.

There have been several prior ex post facto challenges to the 1979 Act and the 1997 amendments in state and federal court. Some statements in prior opinions have caused confusion. We attempt to clarify here.

In Royster, the Third Circuit held that the application of the 1979 Act to an inmate who committed his offense in 1968, when the 1948 Act was in force, did not violate the Ex Post Facto Clause of the Federal Constitution. 775 F.2d at 528. The court discussed, in detail, the major differences between the 1948 and 1979 Acts. For example, the court highlighted the shift from the 1948 Act's focus on both recidivism and "whether the punitive aspect of a prisoner's punishment had been served," to the 1979 Act's exclusive attention "on whether the prisoner would likely commit crimes if granted . . . parole." Id. at 529-30. But it characterized Trantino II as holding "that for pre-Code inmates like Royster[,] the Parole Board should" continue to "consider both recidivism and the punitive aspects of punishment" as it had done under the 1948 Act. Id. at 531. The court therefore stated that "the standards of the 1979 and 1948

22

Acts are identical with respect to inmates convicted before 1979." Id. at 535.

Later courts have incorrectly relied on that sentence to establish that the 1979

and 1948 Acts were identical in all respects.  However, the statutes

themselves, and the discussion of their fundamental differences in Royster,

clearly refute that conclusion.[1]

The Board appears to not have retroactively applied the 1997

amendment's new substantive standard for granting or denying parole to

inmates sentenced before August 19, 1997, the amendment's effective date.  It

did, however, retroactively apply the amendment's repeal of the 1979 Act's

new-information limitation "to all prisoners, including those convicted before

the [a]mendments came into force."  Holmes, 14 F.4th at 256.

In Trantino V, the inmate whose petition we had considered in Trantino

II argued the Board violated the Ex Post Facto Clause by retroactively

applying the 1997 amendment, and therefore considering his "entire life

record," rather than "just his record since his last hearing" as the 1979 Act had

required.  331 N.J. Super. 577 at 582, 603, 610.  In its brief treatment of the

question, the Appellate Division found that application of the 1997 amendment

_____

[1] Because Royster concerned an initial parole hearing, id. at 530, the Third
Circuit did not discuss the difference between the 1979 and 1948 Acts as to the
scope of information the Board may consider at second and subsequent
hearings.

23

permitting reliance on all information "did not violate the ex post facto clause since this change in the law is a procedural modification that does not constitute a substantive change in the parole release criteria." Id. at 610. But the court also stated that "[t]he critical inquiry is whether the statute realistically produces a sufficient risk of increasing the measure of punishment." Ibid. (quoting Loftwich v. Fauver, 284 N.J. Super. 530, 536 (App. Div. 1995)). Although Trantino had committed his crimes in the 1960s, when the Parole Act of 1948 was in force, the court did not discuss the 1948 Act in its analysis. Id. at 607-11.

In Holmes, the Third Circuit reviewed an identical challenge from an inmate who claimed that, under the Federal Ex Post Facto Clause, the Board "should have considered only 'new' information," as required by the 1979 Act, and should not have considered his criminal history. 14 F.4th at 257. The Third Circuit recognized that "New Jersey's 1948 Parole Act governs Holmes's case" because he had committed multiple homicides in the "early 1970s." Id. at 255 n.1, 256. But the court then mistakenly relied on the statement in Royster that "the standards of the 1979 and 1948 Acts are identical with respect to inmates convicted before 1979" to establish that the 1979 Acts and 1948 Acts were identical with respect to what information the Board could consider. Id. at 255 n.1 (quoting Royster, 775 F.2d at 535), 261.

24

With that misunderstanding framing the inquiry, the Third Circuit held that Holmes stated a claim, sufficient to survive a motion to dismiss, for an as-applied violation of the Federal Ex Post Facto Clause. Id. at 260-63. According to the court, by focusing on Holmes's decades-old criminal history, the Board "created a significant risk of prolonging his imprisonment" relative to the law "at the time of [his] crimes," when "New Jersey forbade its Board from examining criminal history during successive parole hearings." Id. at 261. As support, the Third Circuit again cited its "observ[ation] in Royster" quoted above. Id. at 263.

The court then correctly rejected the Board's request that it follow Trantino V, concluding that "a test that formalistically distinguishes between substantive rules and procedural ones finds no foundation in controlling [United States Supreme Court] cases." Id. at 264. As the Third Circuit explained, "[m]ore than a century ago, the Court resolved a pair of ex post facto cases by deciding whether the challenged rules assumed substantive or procedural form. But the Court has long since overruled those cases and renounced their reasoning." Id. at 264-65 (citations omitted).

Believing the 1979 Act's new-information limitation had also been in place under the 1948 Act, the court remanded for discovery to determine whether retroactive application of the 1997 amendments to Holmes "create[d]

25

a significant risk of prolonging [his] incarceration." Id. at 268 (alterations in original) (quoting Garner, 529 U.S. at 251).

IV.

With that background in mind, adjudicating the ex post facto challenge in this case is straightforward.

Trantino V correctly stated that "[t]he critical inquiry is whether the statute realistically produces a sufficient risk of increasing the measure of punishment as to offend the constitutional prohibition." 331 N.J. Super. at 610 (quoting Loftwich, 284 N.J. Super. at 536). But it also implied that a "procedural modification that does not constitute a substantive change in the parole release criteria" cannot violate the Ex Post Facto Clause. Ibid.

The Board no longer defends any such procedural/substantive distinction. Instead, the Board concedes that in the parole context, the "controlling inquiry" is whether the retroactive application of a parole law "creates a significant risk of prolonging incarceration." Garner, 529 U.S. at 250-52. The Board expressly acknowledges that "procedural changes to parole laws are still subject to the" U.S. Supreme Court's "significant-risk test."

That is correct. Under controlling U.S. Supreme Court precedent, "simply labeling a law 'procedural' . . . does not thereby immunize it from scrutiny under the Ex Post Facto Clause." Youngblood, 497 U.S. at 46.

26

Indeed, as the Third Circuit recognized in <u>Holmes</u>, the U.S. Supreme Court has consistently refused "to define the scope of the [Ex Post Facto] Clause along an axis distinguishing between laws involving 'substantial protections' and those that are merely 'procedural.'" 14 F.4th at 265 (quoting <u>Carmell v. Texas</u>, 529 U.S. 513, 539 (2000)). To the extent that <u>Trantino V</u> has been read to mean that procedural changes cannot violate the State or Federal Ex Post Facto Clauses, it is hereby overruled.

But the "controlling inquiry" in determining whether a retroactive application of a new parole law is an ex post facto violation is "whether retroactive application . . . created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes,'" <u>Garner</u>, 529 U.S. at 250 (quoting <u>Morales</u>, 514 U.S. at 509), or "create[d] a significant risk of prolonging [an individual]'s incarceration," <u>id.</u> at 251, <u>beyond that contemplated at the time of the offense</u>.

The U.S. Supreme Court has explained that the ex post facto analysis is concerned "solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred." <u>Weaver</u>, 450 U.S. at 29 n.13. That remains true when it comes to changes in parole laws. <u>See Garner</u>, 529 U.S. at 249 ("[T]he Ex Post Facto Clause . . . bar[s] enactments which, by retroactive operation, increase the

27

punishment for a crime after its commission."); <u>United States ex rel. Forman v. McCall</u>, 709 F.2d 852, 856 (3d Cir. 1983) ("It is a fundamental principle of ex post facto jurisprudence that a court entertaining an ex post facto claim must focus upon the law in effect at the time of the <u>offense</u> for which a person is being punished."). In other words, there is simply no ex post facto problem in retroactively applying to a person the same parole regime that existed at the time he committed his offense.

Here, Krug committed his offense in 1973. The law at the time was the Parole Act of 1948, which required the Board to review "all existing available records" in determining whether to grant or deny parole. <u>L.</u> 1948, <u>c.</u> 84, § 9. The Act expressly commanded the DOC to provide the Board with "information" concerning an inmate's "prior record." <u>Id.</u> § 7. And under the Act, the Board was obliged to weigh "the seriousness of the crime as an element in determining whether the offender's punishment [was] adequate." <u>Trantino II</u>, 89 N.J. at 373-74. Thus, at the time of Krug's offense, the Board was entitled to review "old" information, including an inmate's criminal history and the seriousness of the offense for which the inmate was incarcerated. The 1997 amendment restored the Board's ability to consider that information. In so doing, it poses no risk of increasing Krug's punishment beyond what was contemplated at the time of his offense.

28

That result is consistent with the purposes of the Ex Post Facto Clauses, which safeguard "not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver, 450 U.S. at 30.

When it comes to information the Board could consider, Krug had, at the time of his crimes, fair notice of rules consistent with those imposed by the 1997 amendment. The application of the 1997 amendment to Krug therefore does not evince the kind of overreach the Ex Post Facto Clauses exist to prevent. We agree with the Board that "because the range of information the Board can consider is the same today as it was when Krug committed his crimes, the Ex Post Facto Clause poses no problem here."

Our agreement with the Board on the meaning of the Ex Post Facto Clause, however, does not in any way signal approval of its litigation position either in this case or in earlier cases.

Krug contends that "[t]he Board's shifting position" regarding the differences between the 1948 Act, the 1979 Act, and the 1997 amendments, and which provisions of those laws apply to which inmates, "essentially asserts that it gets to pick and choose which Parole Act applies to a pre-Code inmate based on whichever Act makes it easiest to deny parole."

29

As Krug points out, for many years the Board applied various provisions of the 1979 Act to pre-Code inmates. The one-page form used to deny Krug parole in 2023 provided three options a panel could choose from: (1) "The Panel has determined that you have failed to cooperate in your own rehabilitation. (Effective 8/19/1997)"; (2) "The Panel has determined there is a reasonable expectation that you will violate conditions of parole if released on parole. (Effective 8/19/1997)"; and (3) "The Panel has determined a substantial likelihood exists that you would commit a new crime if released on parole at this time. (Prior to 8/19/1997)." There was no separate option for inmates who committed offenses prior to the 1979 Act.

Krug is also correct that the Board never presented its argument about the 1948 Act in earlier cases that considered ex post facto challenges to the 1997 amendment, namely Trantino V and Holmes. That was true despite the fact that, as Krug notes, both involved people who committed crimes while the 1948 Act was in force. The Board's briefing to the Third Circuit in Holmes failed to mention the 1948 Act at all, which likely led to the confusion about what information the Board could and could not rely on under that Act. Instead, in Holmes, the Board urged the Third Circuit to find the 1997 amendment was merely "procedural."

And at the time the Board finally introduced its argument about the 1948 Act in its supplemental brief to this Court, the Board did not provide a copy of the Act as an attachment to its brief, did not list the Act as a relevant statute in its table of authorities, and did not quote directly from the Act itself. Instead, the Board relied only on what prior cases had stated about the Act. That led Krug, after reading the Board's supplemental brief, to file a request under the Open Public Records Act to procure a copy of the 1948 Act as it existed in 1973. Even at oral argument, the Board presented arguments about the 1948 Act without the text of the Act itself, and without having provided the text of the Act to opposing counsel or to the Court.

While we do not condone the Board's litigation position in this case, it does not change the meaning of the Federal and State Ex Post Facto Clauses. We do not opine on whether the facts of this case, or any case involving a change in law that conferred a benefit on an inmate for many years, and then subsequently repealed that benefit, could implicate due process or fundamental fairness concerns. See U.S. Const. amends. V, XIV; N.J. Const. art. I, ¶ 1; Doe v. Poritz, 142 N.J. 1, 108 (1989) ("Fundamental fairness is . . . appropriately applied in those rare cases where not to do so will subject the defendant to oppression, harassment, or egregious deprivation." (quoting State

31

v. Yoskowitz, 116 N.J. 679, 712 (1989) (Garibaldi, J., concurring in part and dissenting in part))).

V.

For the reasons stated, we affirm the Appellate Division's judgment as modified.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, and HOFFMAN join in JUSTICE WAINER APTER's opinion.  JUSTICE NORIEGA filed a dissent.

Fred Krug,

Appellant-Appellant,

v.

New Jersey State
Parole Board,

Respondent-Respondent.

JUSTICE NORIEGA, dissenting.

In this case, we consider whether the State may retroactively apply a parole law that poses a greater risk of prolonged incarceration than the law that governed an individual's parole eligibility prior to the legislative change. We should not seek an answer to that question by applying a rigid formula, but rather by attuning ourselves to the constitutional principles that animate the Ex Post Facto Clause, namely: notice, governmental restraint, and preservation of the social compact between the government and the governed. Enforcing an ex post facto law transgresses that compact, and an act of the Legislature "contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority." Calder v. Bull, 3 U.S. (3 Dall.) 386, 388 (1798) (Opinion of Chase, J.). Because the State of New Jersey established a clear social compact regarding parole with incarcerated

1

individuals in 1979 and because application of the 1997 amendment to those individuals undermines ex post facto principles by retroactively imposing harsher parole conditions, I must respectfully dissent.

Usually, an ex post facto analysis is relatively straightforward: a court asks whether two legislative enactments, considered in sequence, result in the latter imposing more onerous conditions to the petitioner's disadvantage. Courts must "compare the punishment affixed to the crime at the time of the offense with the punishment affixed at the time of sentencing. If the latter is harsher than the former, the court must apply the punishment in effect at the time of the offense." Peugh v. United States, 569 U.S. 530, 561 (2013). That analysis starts by finding the offense date, moving forward to a change in law, and then evaluating the constitutionality of that change as applied to the offender by asking whether the change increased the punishment for a past act. The majority is correct that a long and unbroken jurisprudential tradition makes such an analysis clear.

Here, however, the State's eleventh-hour introduction of the long-repealed 1948 Parole Act into the equation complicates the analysis. What could have been resolved through a direct application of familiar ex post facto principles now requires a deeper inquiry into the nature and purpose of those principles, especially as they apply to parole. Our task should be to consider

2

the intent and logic of ex post facto jurisprudence, attuned to how its restriction on legislative power informs an understanding of the unique scenario before us.

The Constitution prohibits ex post facto laws because they offend the basic tenets of the social compact between governed people and their government. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . ." Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994); see also Marks v. United States, 430 U.S. 188, 191 (1977) ("[T]he principle on which the [Ex Post Facto] Clause is based -- the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties -- is fundamental to our concept of constitutional liberty."). The Framers included the prohibition in Article I twice -- once in Section 9, restricting the federal government, and again in Section 10, restricting state legislatures -- reflecting its importance as a check on legislative power. See Kring v. Missouri, 107 U.S. 221, 227 (1882) ("So much importance did the convention attach to [the Ex Post Facto Clause] that it is found twice in the Constitution . . . ."). The Clause was meant to ensure that laws do not retroactively impose greater punishment than what was in place at the time a person could reasonably rely on the law to guide their conduct and to "assure

3

that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28-29 (1981).

Focusing an ex post facto analysis on whether a new law increases punishment when compared to the law in effect at the time of the offense works well in the typical sentencing case scrutinizing a single legislative change. But the offense date is always a means to an end, a litmus test that is useful to determine whether a government has violated the social compact because the offense date is when an offender triggers the conditions of the compact: if a governed individual violates a clearly established law, the government may impose clearly established penalties.

Parole, however, is different. Over the potentially very long period during which an incarcerated individual is subject to a parole regime, the government may legitimately change that regime to the individual's advantage, revising the social compact and thereby recentering the ex post facto analysis away from the offense date and onto the legislative change. See Calder, 3 U.S. at 391 (Opinion of Chase, J.) ("I do not consider any law ex post facto, within the prohibition, that mollifies the rigor of the criminal law . . . .").

The unique facts of this case -- two legislative changes in the context of parole law -- reveal that the State violated the social compact when it enforced

4

a newly established law against a defendant who was properly on notice that a less harsh restriction governed his conduct vis-à-vis parole. Casting our gaze back to the law at the time of Krug's criminal act occludes the Legislature's exercise of its power to amend a law, as the Legislature did here, to Krug's advantage.

The date of the offense is a tool that serves ex post facto jurisprudence's broader inquiry into fair notice and government restraint. See Lynce v. Mathis, 519 U.S. 433, 441 (1997) (declaring "the central concerns of the Ex Post Facto Clause" to be "the lack of fair notice and governmental restraint" (quoting Weaver, 450 U.S. at 30)). The U.S. Supreme Court's "decisions prescribe that two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver, 450 U.S. at 29 (footnote omitted). Neither of these elements require mooring the analysis to the date of the offense; instead, "it is the effect, not the form, of the law that determines whether it is ex post facto." Id. at 31.

Indeed, the U.S. Supreme Court has said explicitly that

> [j]ust what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition [against ex post facto laws] cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure

5

> substantial personal rights against arbitrary and oppressive legislation . . . .
>
> [Beazell v. Ohio, 269 U.S. 167, 171 (1925).]

Thus, more important than hemming an analysis in to the date of the offense is conducting an analysis that protects against government overreach in the form of a retroactive law that "might grow out of the feelings of the moment" to disadvantage an offender. Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138 (1810).

That broader principle becomes especially clear in the context of parole, where we should heed the U.S. Supreme Court's caution to avoid formulaic jurisprudence. Parole laws and guidelines are unique and distinct from sentencing laws. Parole laws do not define punishment in the first instance but govern its administration over time. They are thus ill-suited to a rigid, date-fixed analysis. Instead, a court must evaluate whether a legislative change at issue increases the actual risk of prolonged incarceration under the law in force at the time of the change.

In the nuanced context of parole, "[t]he controlling inquiry" as to whether a change in parole law is an ex post facto violation is "whether retroactive application of the change in [parole] law created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" Garner v. Jones, 529 U.S. 244, 250 (2000) (quoting Cal. Dep't of Corr. v.

Morales, 514 U.S. 499, 509 (1995)).  A potential parolee seeking to demonstrate that a change in law violates the ex post facto clause "must show that as applied to his own sentence the law created a significant risk of increasing his punishment."  Id. at 255.

Consideration of the law at the time of the offense becomes far less significant in the parole context because the social compact focuses almost exclusively on the passage of time and conduct during incarceration.  In fact, the Court has been "careful . . . not to adopt a single formula for identifying which legislative adjustments, in matters bearing on parole, would survive an ex post facto challenge," id. at 252 (citing Morales, 514 U.S. at 509), and has time and again stressed that such a determination "must be a matter of 'degree.'"  Morales, 514 U.S. at 509 (quoting Beazell, 269 U.S. at 171).

To meet the burden of an ex post facto inquiry, a parole petitioner must show "by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule."  Garner, 529 U.S. at 255.  That analysis is not a simple comparison between an active law and its pre-amendment predecessor, but is rather a more nuanced assessment that considers the "sum of . . . factors" "within the whole context of [a State's] parole system."  Id. at 251-52.

The majority is correct that the facts of ex post facto parole cases in both the U.S. Supreme Court and the Third Circuit have caused those courts to focus their ex post facto analyses on the "parole law in effect at the time of the inmate's crime." Royster v. Fauver, 775 F.2d 527, 533 (3d Cir. 1985). But those cases involve only a single change in parole law between offense and denial of parole. See id. at 528-30; Garner, 529 U.S. at 247; Morales, 514 U.S. at 503; Mickens-Thomas, 321 F.3d 374, 377-78 (3d Cir. 2003). When a single legislative change has occurred, an ex post facto evaluation can take place only as between the amendment and the law that governed the potential parolee at the time of offense, so attention to guidelines in place at the time of the crime makes sense. Here, by contrast, the Legislature enacted the more lenient 1979 Parole Act after the time of Krug's offense, expressly applied it to him and all other presently incarcerated individuals, and then amended the law again in 1997, making parole more difficult to achieve.

More instructive than a factual analogy to ex post facto parole cases, therefore, is the legal principle guiding them: whether the application of the amended law made it more difficult for the petitioner to obtain parole than under the law in effect prior to the change. See, e.g., Mickens-Thomas, 321 F.3d at 376. That logic requires an inquiry into how the law in effect prior to

8

the legislative change, as actually applied to the individuals it governed, shaped their reasonable expectations and prospects for release.

Ultimately, while the date of offense has historically served as a useful reference point -- because it marks when a person first enters the government's criminal justice system -- the more constitutionally faithful analysis must look to whether a retroactive change in law interferes with liberty interests grounded in fair notice and government restraint. That is because the Ex Post Facto Clause protects "a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." Carmell v. Texas, 529 U.S. 513, 533 (2000).

In the context of a change in parole law during incarceration, that analysis requires attention to whether the legislative change significantly increases the risk of prolonged incarceration relative to the law that governed the individual prior to the change. The effective date of a retroactive legislative change to parole law becomes the date on which the government establishes a new mechanism by which it may either deprive or permit relief from incarceration. That date, rather than the date of the offense, is therefore the proper baseline for an ex post facto analysis of a parole law that increases the potential for prolonged incarceration.

9

Applying these principles to the present case, I would hold that application of the 1997 parole law to Krug is an ex post facto violation in light of the 1979 Act, which properly governs the conditions of Krug's parole. In 1979, the Legislature exercised its legitimate prerogative to modify its social compact with incarcerated individuals then entitled to consideration for parole. It did so in such a way that mollified the rigor of the Parole Act by restricting the amount of information the Parole Board may legally consider and requiring a grant of parole if no new information appears within that scope. See Calder, 3 U.S. at 391.

The 1979 Act repealed and replaced the 1948 Act, and included the specific provision that "this act shall apply to all persons now serving or hereafter sentenced to State correctional facilities and all persons now serving or hereafter sentenced to county jails, workhouses or penitentiaries." L. 1979, c. 441, § 2(a). Because the Legislature's passage of the 1979 Act did not violate any constitutional prohibitions, that law reset the ex post facto analysis for Krug.

In 1997, the Legislature made the laws governing Krug's parole harsher and put his possibility of parole further out of reach. By permitting the Board to consider a potential parolee's full record -- including the original offense -- the government clearly "produce[d] a sufficient risk of increasing the measure

10

of punishment" by increasing the likelihood of a parole denial that would effectuate a longer prison sentence.  Morales, 514 U.S. at 509.  A new law may violate the Ex Post Facto Clause "even if a statute merely alters penal provisions accorded by the grace of the legislature."  Weaver, 450 U.S. at 30.  Thus, the fact that the 1979 Act, by the grace of the Legislature, mollified the parole conditions affecting Krug, does not alter the fact that the 1997 amendment modified those conditions in such a way that increased punishment after Krug was on fair notice of conditions governing his parole for nearly two decades.

The State's attempt to resurrect the 1948 Parole Act for purposes of ex post facto comparison, after it had been explicitly repealed and functionally replaced for decades, creates a legal fiction that the 1979 Act never existed.  That fiction distorts the historical relationship between the State and Krug, allowing the government to evade constitutional scrutiny by rewriting its own legislative timeline.

In reality, the Legislature subjected Krug and similarly situated individuals to the 1979 Parole Act when it passed the provision.  That law, enacted with retroactive effect, replaced and repealed the 1948 Act and governed the parole process for all those incarcerated at the time.  It established the expectations under which Krug served his sentence and sought

11

parole.  Then, in 1997, the State enacted new parole provisions that imposed more restrictive conditions that created a substantial risk of prolonged incarceration.  In 2022, the Parole Board applied those stricter standards and denied Krug parole.  The Ex Post Facto Clause was specifically designed to forbid and prevent such maneuvering.

In my view, this is precisely the kind of legislative shift "which might grow out of the feelings of the moment" that the Ex Post Facto Clause was designed to prevent.  Fletcher, 10 U.S. at 138.  The risk of increased punishment under the 1997 law, applied retroactively, violates the notice-based protections at the core of a long tradition of ex post facto jurisprudence.

While I respect the majority's effort to adhere to an established analytical framework, I believe our constitutional duty requires more.  We must look beyond formal categorizations and examine whether the law, as applied, undermines the principles of notice and restraint that lie at the heart of ex post facto protections.  Those commitments are not served by rigid formulas that ignore the lived reality of how parole law functions.  Rather, they require that we scrutinize whether retroactive legal changes disrupt settled expectations and create a real risk of increased punishment.  That broader inquiry compels the conclusion that the retroactive application of the 1997 law to Krug is unconstitutional.

12

For those reasons, I respectfully dissent.